**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LATOYA CONGRESS, *on behalf of* J.M., | ) | CASE NO. 1:22-CV-01623-BYP |
| Plaintiff, | ) | UNITED STATES DISTRICT JUDGE |
| | ) | BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY ADMINISTRATION, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Latoya Congress ("Ms. Congress") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying the application of her minor child, J.M., for Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

## II.      PROCEDURAL HISTORY

Ms. Congress previously filed an application for children's disability benefits on behalf of J.M., her minor child. J.M was found not disabled in an ALJ decision dated January 22, 2020. (Tr.

1

266-84).[1] The Appeals Council denied a request for review of that decision on October 21, 2020. (Tr. 285). No further appeals were taken.

On January 25, 2020, Ms. Congress filed a new application for SSI benefits on behalf of J.M., alleging a disability onset date of June 1, 2015. (Tr. 388). This application was denied initially and upon reconsideration. (Tr. 314-17, 320-21). Ms. Congress requested a hearing before an administrative law judge ("ALJ"). (Tr. 337). On August 31, 2021, an ALJ held a telephonic hearing due to the COVID-19 pandemic, during which Ms. Congress, represented by counsel, testified. (Tr. 250-65).

On September 13, 2021, the ALJ issued a written decision finding that J.M. was not disabled. (Tr. 161-71). The ALJ's decision became final on August 23, 2022, when the Appeals Council declined further review. (Tr. 1-7). Ms. Congress filed a Complaint on September 13, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). Ms. Congress asserts the following assignments of error:

(1) Whether substantial evidence supports a finding that the Plaintiff's severe impairments functionally equal the Listings, with marked limitations in acquiring and using information and caring for self.

(2) Whether new and material evidence warrants remand.

(ECF Doc. 6-1, PageID#1028).

### III.    BACKGROUND INFORMATION

#### A.  <u>Personal, Educational, and Vocational Experience</u>

J.M. was born in 2006. (Tr. 162). Under Social Security regulations, J.M. was a school-age child on the date the application was filed, and she was an adolescent at the time of the ALJ's decision. (*Id.*). She has not worked since January 25, 2020, the application date. (*Id.*).

---

[1] The administrative transcript is located at ECF Doc. 4 on CM/ECF.

B.  **Relevant Hearing Testimony**

Ms. Congress testified on behalf of J.M, her minor child, at the administrative hearing. At the time of the hearing, J.M. was in the ninth grade, had just started a new school year, and was attending school in person. (Tr. 252). Ms. Congress stated that J.M. has difficulty getting along with others during the school year. (Tr. 253). On the second day of school, J.M. and a few female classmates were involved in an incident, and the principal had to speak with them. (*Id.*).

Ms. Congress further testified that J.M. takes Abilify, Adderall, Zoloft, Melatonin, and Sertraline for her medical conditions. (*Id.*). J.M. had an individualized education plan ("IEP") for the school year. (Tr. 254). Ms. Congress testified that J.M. was being pulled out of her math and reading classes and given assistance. (*Id.*).

Ms. Congress also testified about J.M.'s behavior at home. (Tr. 255-56). Ms. Congress stated that J.M. wants to be in the dark all day, eats in the dark, and spills food on her clothes. (Tr. 255). She described J.M. as not being "at her age level…as far as the functions." (*Id.*).  Ms. Congress further testified that she must repeat herself "[a]t least 15 times" for J.M. to complete tasks such as putting on her clothes and doing her chores. (*Id.*). She also testified that J.M. throws objects, stomps, has loud outbursts, and yells when J.M. becomes angry. (*Id.*). Ms. Congress also stated that J.M. has difficulty staying asleep at night, and that J.M. only gets four hours of sleep per night when she takes Melatonin. (Tr. 256).

Ms. Congress further testified about J.M.'s difficulties interacting with peers her age. (Tr. 258). Ms. Congress explained that J.M. does not get along very well with her peers. (*Id.*). On a scale of one to ten (*i.e.*, one being she does not get along at all and ten being she gets along very well with her peers), Ms. Congress rated J.M.'s quality of interaction as a three out of ten. (*Id.*).

3

She stated that J.M. has difficulty talking with peers and thinks that someone is "out to get her," *i.e*, someone is looking at or talking about J.M.). (*Id.*).

According to Ms. Congress, J.M.'s medications do not help with J.M.'s belief that people are "out to get her." (Tr. 259). Ms. Congress testified that J.M's doctors changed the dosages of J.M.'s medications, but those changes have been ineffective. (*See id.*). J.M.'s doctors have not recommended any other treatment besides counseling and the prescribed medications. (*Id.*). Ms. Congress further testified that she finds J.M. crying every day, especially at night. (*Id.*).

### C.  Relevant Medical/Non-Medical Opinion Evidence

#### 1.  *State Agency Medical Opinions*

##### a.  Obiaghanwa Ugbana, M.D.

At the initial level of review, Dr. Ugbana found that J.M. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 295-96). Dr. Ugbana further found that J.M. had no limitations in the domains of caring for self and health and physical well-being. (Tr. 297).

##### b.  Louis Goorey, M.D.

At the reconsideration level, Dr. Goorey found that J.M. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (Tr. 303-05). Dr. Goorey further found that J.M. had no limitation in the domain of health and physical well-being. (Tr. 305).

#### 2.  *Deborah Brewster, M.D.*

##### a.  Opinion Evidence Before the ALJ

On May 20, 2021, Dr. Brewster wrote a medical source statement that discussed J.M.'s condition and limitations. (Tr. 990-92). Dr. Brewster opined that J.M. had no evidence of

4

limitations in acquiring and using information, moving about and manipulating objects, and health and physical well-being. (Tr. 990-91). Dr. Brewster further opined that J.M. had moderate limitations in attending and completing tasks, interacting and relating with others, and caring for self. (*Id.*). Dr. Brewster noted that J.M.'s medications may affect her appetite and sleep. (Tr. 991). Dr. Brewster further noted that she was unaware of any problems with J.M.'s school attendance. (Tr. 992). Dr. Brewster opined that J.M. requires weekly therapy, case management, and monthly psychiatric visits. (*Id.*). Dr. Brewster further opined that J.M. has a chronic condition that "will interfere with functioning long term." (*Id.*). Finally, Dr. Brewster noted that J.M. was diagnosed with ADHD, PTSD, ODD, and unspecified mood disorder, and that J.M.'s medications are adjusted as needed. (*Id.*).

### b. Opinion Evidence Submitted to the Appeals Council

On September 19, 2021, after the ALJ's decision was issued, Ms. Congress requested "a transfer" because she was "frustrated" that J.M. "was not granted disability." (Tr. 148). According to Dr. Brewster, Ms. Congress stated that her lawyer informed her the denial was a result of Dr. Brewster's notes stating that J.M. was "okay." (*Id.*). Dr. Brewster informed Ms. Congress that this was inaccurate and read some notes on the specifics on J.M.'s mood and behavior, as well as the need for the increase in medication dosage. (*Id.*).

On November 18, 2021, Dr. Brewster wrote a new opinion statement assessing J.M.'s limitations. (Tr. 92-94). Dr. Brewster stated that J.M. had marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for self, and health physical well-being. (*Id.*). Dr. Brewster further assessed that J.M. had no limitation in the domain of moving about and manipulating objects. (Tr. 93).

In support of her opinion regarding the acquiring and using information domain, Dr. Brewster reported that J.M. requires an IEP due to her ADHD, mood disorder, and PTSD. (Tr. 92). Dr. Brewster further noted that J.M. struggled with learning and applying learned information, and that J.M is unable to complete work unless she works individually with an intervention specialist. (*Id.*). Regarding J.M.'s attending and completing tasks domain, Dr. Brewster noted that J.M. struggles with focus and staying on tasks, and that J.M. requires one-on-one interaction with an intervention specialist to complete her work. (Tr. 93). With respect to J.M.'s caring for self domain, Dr. Brewster reported that J.M. is unable to express her needs, wants to complete all daily living skills in the dark due to her mood disorder and PTSD, and requires frequent reminders to complete tasks. (Tr. 94). Regarding J.M.'s health and physical well-being, Dr. Brewster reported that J.M. has frequent headaches and stomachaches when anxious. (*Id.*). Dr. Brewster noted that J.M. regularly attends school unless she is suspended for behavior/aggression issues. (*Id.*). Dr. Brewster further noted that J.M. has an IEP with "many accommodations," and she requires weekly therapy and monthly psychiatric appointments. (*Id.*). Finally, Dr. Brewster opined that J.M. has a chronic disorder that interferes with her daily living. (*Id.*). Dr. Brewster referred the reviewer to read her notes that "are thorough for any additional information regarding diagnosis and medication." (Tr. 95). Dr. Brewster offered no explanation regarding any changes that had occurred with J.M. that resulted in Dr. Brewter's new, more restrictive opinion. (*See generally* Tr. 92-95).

### 3. *Jessica Cornman*

On December 16, 2020, Ms. Cornman, J.M.'s general education teacher, completed a Teacher Questionnaire for J.M. (Tr. 601-08). Ms. Cornman opined that J.M. had some problems in the acquiring and using information domain. (Tr. 602). Specifically, Ms. Cornman opined that J.M. had no problem in comprehending oral instructions, understanding school and content

vocabulary, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (*Id.*). Ms. Cornman further opined that J.M. had a "slight" problem in reading and comprehending written material, providing organized oral explanations and adequate descriptions, and expressing ideas in written form. (*Id.*). Ms. Cornman explained that J.M. seems to be able to successfully complete the majority of her work on an independent level and will typically ask questions for clarification. (*Id.*). Ms. Cornman additionally found that J.M. had no problems in the domains of attending and completing tasks, interacting and relating with others, moving and manipulating objects, and caring for herself. (Tr. 603-06).

### D. Relevant Non-Medical/Medical Evidence

#### 1. *Non-Medical Evidence Before the ALJ*

On January 21, 2020, school evaluators tested J.M. to determine suitability for an IEP. At the time of the referral, J.M.'s teachers noted that she struggled significantly with completing work and staying focused. (Tr. 512). Although her teachers observed that J.M. was generally able to interact appropriately with peers and follow classroom expectations, the teachers also observed that J.M. struggled with sustained focus on academic tasks, leading to task avoidance and off-task behaviors. (*Id.*). According to J.M.'s mother, J.M. experienced difficulty at home staying focused, became frustrated very quickly, and was overly influenced by her friend group. (Tr. 513).

As part of J.M.'s initial evaluation team report, the Reynolds Intellectual Assessment Scales, Second Edition ("RIAS-2") was administered on December 16, 2019. J.M. scored a verbal intelligence index of 72, a nonverbal intelligence index of 73, a composite intelligence index of 68, a composite memory index of 88, and speeded processing index of 101. (Tr. 487). As a result, J.M. received a composite I.Q. score of 69, which the examiner noted to be "significantly below

average." (Tr. 488). But the examiner further observed that, while J.M.'s score was significantly below average range, there was significant variance "among her scores such that her Composite Intelligence Index score doesn't represent her abilities." (*Id.*). The examiner explained that there was a 95 percent chance that J.M.'s true score was between 66 and 74. (*Id.*).

Ultimately, due to J.M.'s problems with inattentiveness, J.M. was enrolled in an IEP on January 21, 2020. (Tr. 514-16). The accommodations under this IEP included small groups for testing, extended time, frequent breaks, directions being read aloud, and using a calculator as permitted. (Tr. 552).

School records reflect that J.M. was suspended from school due to her behavior. From January 29, 200 through February 1, 2020, J.M. was suspended from school for assault and disruptive behavior. (Tr. 401).

On February 6, 2020, a new IEP was put in place. (Tr. 668). J.M.'s reading comprehension goal was that, after reading a sixth-grade reading selection, she would answer ten comprehension questions with 80% accuracy by the end of the IEP. (Tr. 671). Her behavior goal was that, when upset, J.M. would respond appropriately in three out of five trials by the end of the IEP. (Tr. 672). Her mathematical goal was that, when given word problems, J.M. would use a calculator to solve story or number math problems in math curriculum assignments and assessments 100% of the time with 70% accuracy in four out of five trials by the end of the IEP. (Tr. 673).

J.M. took the R.E.A.D. Fluency, Comprehension and Mathematics Assessment three times: on March 18, 2020 (Tr. 465-71); September 3, 2020 (Tr. 458-64); and October 26, 2020. (Tr. 618-27). The three tests all yielded similar findings for mathematics: evidence of J.M. struggling with mathematical concepts and skills to be mastered by the end of sixth grade resulting in a negative impact on her performance in that subject (Tr. 463, 469-70, 627). J.M.'s fluency was at or above

her current grade level. (Tr. 461, 468, 624). Her comprehension was at or above grade level during the first test (Tr 468), but later test results indicated she was less than four years behind for nonfiction and less than one year behind for fiction. (Tr. 461, 624).

On January 28, 2021, J.M. had an IEP for seventh grade. (Tr. 520). She took the I-ready diagnostic test during the fall and winter of the school year. She had a reading assessment score at the fourth-grade reading level and a vocabulary score at the third-grade level. (Tr. 522). Her literature comprehension fell from sixth-grade level to the fifth-grade level. (*Id.*). Her comprehension of information test was at the fourth-grade level. (*Id.*). In her Ready Math diagnostic testing, J.M.'s overall grades for fall and winter were at a fifth-grade level. (Tr. 523). Her number and operations grade level decreased from a seventh-grade level to a fourth-grade level. (*Id.*). Her algebra and algebraic thinking level decreased from a sixth-grade level to a fifth-grade level. (*Id.*). Her measurement and date level improved from a third-grade level to a fifth-grade level. (*Id.*). Her geometry improved from a fourth grade to an eighth-grade level. (*Id.*).

J.M.'s January 2021 IEP included a reading comprehension goal in which J.M. would be given the main idea and two key details, answered literal and inferential comprehension questions, highlighting unknown words in the text, and defined their meaning. (Tr. 532). Her math goal included an exercise that, when given a multi-step word problem or equation and following the common core standards for eighth-grade mathematics, she would identify the correct operation needed to solve the problems, and then solve it correctly. (*Id.*). J.M.'s behavioral goal was that when upset or frustrated with a peer, adult, or an academic task, she would respond appropriately by using calming techniques and conflict resolution strategies, including asking to take a break when needed. (Tr. 533).

J.M.'s eighth-grade report card showed that she passed all classes, with grades ranging from A for Art, Music, and the third quarter of Science, to D for her fourth quarter of English Language and second quarters of Science and Social Studies. (Tr. 549). J.M. exhibited a positive outlook and attitude during English Language classes; was never tardy; and was absent eight times during the fourth quarter, but not at all during the first three quarters. (*Id.*).

On June 8, 2021, Ms. Jordan Pressman, J.M.'s intervention specialist, completed a School Activities Questionnaire. (Tr. 552). She reported that J.M. attended the entire school year virtually. (*Id.*). Ms. Pressman reported that J.M. requires multiple explanations when trying to follow directions due to not focusing in her general education sessions; struggles with staying on task and task completion, but will complete the task when supervised by a teacher; was below average in her ability to understand and complete assignments on time; responds appropriately to changes in her virtual session times; does not respond well to criticism; and was below her grade level functionality in the areas of comprehension, mathematics, and behavioral skills. (*Id.*). Due to working virtually, Ms. Pressman was unable to observe J.M.'s ability to exhibit age-appropriate hygiene and self-care; her ability to keep up with peers in sports, games, and other extracurricular school activities; and some aspects of her ability to get along with her peers and teachers. (Tr. 553).

## 2.  *Medical Evidence Before the ALJ*

Prior to the January 25, 2020 filing date, J.M. was prescribed Abilify, melatonin, Ritalin, and Vyvanse by her primary care provider. (Tr. 692). Routine examinations after the alleged onset date did not yield any evidence of psychiatric based abnormality (Tr. 698, 702, 710, 714).

J.M. received psychiatric care from Dr. Deborah Brewster. On January 20, 2020, J.M. reported being mad, and she was tearful when discussing flashbacks relating to an assault she

experienced when she was younger. (Tr. 723). Dr. Brewster noted that J.M. was distractable and displayed poor judgment and insight. (Tr. 725). Dr. Brewster increased J.M.'s dosage for Adderall and Zoloft. (Tr. 725).

On January 22, 2020, Ms. Congress reported that J.M.'s newly prescribed medications were working, but J.M. sometimes did not feel focused or refused to work. (Tr. 724). Dr. Brewster noted that J.M. was suspended for cursing at her principal and for inappropriately touching a male student. (*Id.*). Although J.M.'s sleep was good, Dr. Brewster noted that Ms. Congress reported hearing J.M.'s nightmares and J.M. talking in her sleep. (*Id.*). Dr. Brewster also noted that Ms. Congress reported that J.M. had variable appetite, mad/sad moods, fear of the dark and feeling as if there was something next her, nightmares, and flashbacks. (*Id.*). J.M.'s mental status included an angry mood, dysthymic/tearful affect when discussing mood and flashbacks, anxiety regarding her mother (who was ill), and display of distractibility and poor judgment. (Tr. 725). Dr. Brewster's impression was that J.M. exhibited ADHD, ODD, unspecified mood disorder, an PTSD. (*Id.*).

On March 10, 2020, Ms. Cindy Ward, LSW, saw J.M. (Tr. 681). J.M. was referred after two incidents: (1) a January 28, 2020 incident where J.M. was choked by a principal after J.M. was fighting with another girl; and (2) a February 28, 2020 incident where J.M.'s teacher pulled J.M.'s braids and hair to prevent J.M from "getting her things in the classroom." (*Id.*). Ms. Congress reported that J.M. had multiple suspensions for fighting, issues with the principal, and sexual inappropriateness, with each suspension lasting three days over the last two school years. (Tr. 684). J.M. reported that she often feels as though there is someone behind her when walking in a dark room. (Tr. 685). Ms. Ward observed that J.M. had euthymic and depressed mood, constricted affect, impairment of attention/concentration, and impaired judgment at times. (*Id.*). Ms. Congress reported that J.M. was sad all the time, was thinking about death, and had feelings

11

of worthlessness and loneliness. (Tr. 686). J.M. worried that something bad will happen and felt like nobody liked her, and that things were not real. (*Id.*). J.M. and Ms. Congress reported that J.M. was easily annoyed by others; left her seat when she was expected to be seated; had difficulty waiting her turn; did not pay attention to details or made careless mistakes; had difficulty keeping attention to what needed to be done; did not seem to listen; did not follow through when giving directions; had difficulty organizing tasks and activities; avoided or did not want to start tasks that required ongoing mental effort; was easily distracted by noises; was forgetful; and problems falling asleep. (Tr. 686). J.M.'s diagnoses included PTSD; disruptive mood dysregulation disorder; and ADHD, combined presentation. (Tr. 687). J.M. was prescribed case management, counseling, and continued medication management. (*Id.*).

On April 7, 2020, Dr. Brewster evaluated J.M. (Tr. 726). Ms. Congress reported that because J.M. attended school virtually at home, Ms. Congress was able to keep J.M. on track, J.M. was arguing less, and she had fewer nightmares, J.M.'s appetite was stabilizing, J.M. felt sad two to three times a week, J.M. was less irritable, and J.M.'s anxiety remained the same. (*See* Tr. 731). Dr. Brewster's mental exam documented complaints of J.M.'s mood being sad two to three times a week; dysthymic affect and tearfulness when discussing moods and flashbacks; distractibility; and poor judgment and insight. (Tr. 732). Dr. Brewster increased J.M.'s dosage for Zoloft in July 2020 to treat her anxiety and depression. (Tr. 757).

On August 25, 2020, J.M. reported to Dr. Brewster that school was still virtual, and she was able to focus. (Tr. 763). J.M.'s behavior had improved. (Tr. 764). She reported that she experienced no nightmares, had fluctuating appetite, was sad about one to two times a week lasting for an hour, and had the same amount of anxiety. (*Id.*). J.M.'s mental exam documented a happy mood with a sad mood about one to two days a week; a dysthymic and tearful affect when

discussing moods and flashbacks; anxiety but did not appear anxious; and displayed distractibility, poor judgment, and poor insight. (Tr. 765).

On October 26, 2020, J.M. reported to Dr. Brewster that she was still attending school virtually. (Tr. 844). Ms. Congress reported that J.M. is doing well with online school, takes breaks when she is unable to focus, and feels that she is better able to focus online than in person. (*Id.*). Ms. Congress also reported that J.M.'s behavior was "still at a good spot," but she did have two anger outbursts since the last month. (*Id.*). Ms. Congress reported that J.M. was talking in her sleep and could be having occasional nightmares. (*Id.*). J.M. reported feeling sad twice a week, having the same anxiety, and having some flashbacks. (*Id.*). J.M.'s mental status examination results remained the same. (Tr. 845). Dr. Brewster increased J.M.'s Zoloft dosage for J.M.'s anxiety, depression, and PTSD. (*Id.*).

On November 24, 2020, Ms. Congress reported that J.M. was being tutored five days a week and was doing well online. (Tr. 851). Ms. Congress further reported that J.M.'s behavior was better. (Tr. 852). J.M.'s sleep improved with no nightmares, but J.M. became tired if she did not get enough sleep. (*Id.*). J.M. had variable appetite, was feeling sad twice a week, and remained anxious. (*Id.*). Dr. Brewster's mental status examination remained the same, as did her impression in which all severe impairments were improving. (Tr. 853).

On January 26, 2021, Ms. Congress reported that J.M. was doing well with online school, and her teachers agreed. (Tr. 911). Ms. Congress told Dr. Brewster that J.M. was having angry outbursts once a day, but they would resolve quickly. (*Id.*). J.M.'s sleep was better, appetite was better, mood was happy, but she felt sad one to two times a week. (*Id.*). She experienced nightmares and flashbacks about one to two times a week. (*Id.*). On May 11, 2021, Ms. Congress reported that, although J.M. was struggling with mathematics, her grades were improving and she was able

to focus until her medications wore off in the afternoon. (Tr. 984). Ms. Congress stated, "[T]his is working for her." (*Id.*). On examination, J.M. reported some anxiety due to her mother being diagnosed with skin cancer, but Dr. Brewster reported J.M. did not appear anxious over the phone. (Tr. 986).

On February 1, 2021, J.M. returned to counseling with Ms. Bethany Baughman, a provider that treated J.M. prior to the filing date. (Tr. 891). At her intake, J.M. reported that she enjoyed doing virtual school and was doing well, though she wanted to work on her temper. (Tr. 891). J.M. started biweekly therapy, presenting with a normal mental status other than her behavior and attitudes being described as guarded on April 6, 2021 (Tr. 462, 466) and May 11, 2021 (Tr. 962). Ms. Congress reported that J.M. was irritable, moody, and aggressive. (Tr. 898, 903, 950, 962, 966, 972, 978).

On June 11, 2021, J.M. reported to Dr. Brewster that she was up at night thinking about her past and then would sleep during the day. (Tr. 1003). She reported she felt sad five days a week, and she was worried about her mother. (*Id.*). Ms. Congress reported that J.M. was shutting down lately, did not want to talk, wanted to stay in her room, experienced mood swings, and had variable appetite and mood. (*Id.*). Dr. Brewster observed that J.M. had soft speech, sad mood, and fair insight and judgment. (Tr. 1004). Dr. Brewster increased J.M.'s dosage for Abilify, started Trazadone, and continued the Adderall, Zoloft, and melatonin. (Tr. 1005).

On July 26, 2021, Ms. Congress reported that there was "a little improvement" with medication for J.M.'s behavior. (Tr. 998). Ms. Congress reported that J.M. had variable appetite. (*Id.*). J.M. described that she experiences "all of [the moods]" and that "sometimes [her] mood is [she] don't want to be bothered." (*Id.*). She reported feeling sad two to three days for a few hours. (*Id.*). Ms. Congress reported that J.M. was showering in the dark and experiencing mood swings.

(*Id.*). J.M. told Ms. Congress that she likes to be in the dark, and that she also finds it relaxing to take a shower in the dark. (*Id.*).

On August 3, 2021, Ms. Congress reported being concerned about J.M spending time in the dark and her mood swings. (Tr. 995). J.M. reported she spent time in the dark because it was relaxing. (*Id.*). J.M. reported that once she woke up from a nightmare, she had difficulty falling back asleep. (*Id.*).

### 3.  *Evidence Submitted to the Appeals Council*

On appeal, Ms. Congress produced additional treatment records that covered the period of September 14, 2021, to June 17, 2022. (Tr. 17-50, 68-91, 101-57). On September 29, 2021, after the ALJ's written decision was issued, Ms. Congress told Dr. Brewster that she was frustrated that J.M. "was not granted disability." (Tr. 148). She reported that her attorney informed her that J.M.'s denial was because of Dr. Brewster's notes. (*Id.*). J.M. reported that she was arguing with her teachers, and she had an altercation with a peer the day before and was sent home as a result. (*Id.*). She reported that her mood was "up and down," and she wants to do everything in the dark. (*Id.*). J.M. explained that "she just likes being in the dark." (*Id.*). Dr. Brewster's mental status examination revealed soft speech, sad and irritated mood, and poor insight and judgment. (Tr. 150). Dr. Brewster still assessed J.M. with unspecified mood disorder, ADHD, ODD, PTSD, and primary insomnia. (*Id.*). Because J.M.'s mood and irritability remained "problematic," Dr. Brewster increased J.M.'s Abilify dosage. (*Id.*). On November 18, 2021, Dr. Brewster completed a new form assessing that J.M. now had marked limitations in all domains, except for no limitation in the moving about and manipulating objects domain. (Tr. 92-94).[2]

---

[2] A more detailed summary of Dr. Brewster's later-issued opinion is included in the "Relevant Medical/Non-Medical Opinion Evidence" section of this Report and Recommendation.

On November 29, 2021, Ms. Congress reported to Dr. Brewster that J.M. would sometimes get distracted, J.M.'s behavior was "still up and down," J.M. required reminders to do chores, and J.M. was talking back more than usual. (Tr. 139). Ms. Congress reported that J.M. was "doing okay" in school and had grades ranging from As to Cs. (*Id.*). J.M. reported that her appetite was "okay," and Ms. Congress reported that J.M.'s appetite was better. (Tr. 140). J.M. described her mood as "mad" although nothing specific happened and reported feeling sad two times a week. (*Id.*). Ms. Congress reported that J.M. was irritable at least four days a week. (*Id.*). Dr. Brewster increased J.M.'s Abilify dosage. (Tr. 141).

J.M. continued to received counseling with Ms. Baughman, her counseling provider, in 2022. On January 3, 2022, J.M. reported feeling "okay." (Tr. 136). Ms. Congress stated that the school reported behavioral problems at the end of the day, such as throwing things out into the hallway. (*Id.*). On January 18, 2022, J.M. reported that her mood had been calm, denied isolating herself from others, said she was feeling happy with her social life, and stated she had an irregular sleep schedule. (Tr. 133). J.M. also reported that the main thing she struggled with is her energy level and forgetting to do things that her mother instructed. (*Id.*). On January 25, 22, Ms. Congress reported that J.M. was doing well in school, but the school implemented a behavioral chart for J.M. (Tr. 126). Ms. Congress reported that J.M.'s behavior was better at home and that J.M. was able to fall asleep with Trazodone, but she would wake up due to nightly nightmares. (*Id.*). Ms. Congress reported that she hears J.M. screaming and observes J.M. sleepwalking. (*Id.*). J.M.'s mental status exam revealed soft speech; irritated, angry, and sad mood; cooperative demeanor; unremarkable thought content, thought process, and perception; alert attention; full orientation; and fair insight and judgment. (Tr. 128-29).

On February 28, 2022, Ms. Congress reported that the school developed a behavioral plan for J.M. that seemed to help. (Tr. 123). She also reported that J.M. had been getting into some arguments with peers. (*Id.*). J.M.'s mental status exam revealed J.M. had generally relaxed and engaged behavior, unremarkable speech, neutral mood, appropriate affect, unremarkable thought content and perception, and appropriate insight and judgment. (*Id.*). On March 1, 2022, J.M. reported feeling good and having more good days than bad days, as well as fewer nightmares. (Tr. 121).

On April 28, 2022, Ms. Congress reported to Dr. Brewster, J.M.'s psychiatrist, that she was receiving calls from J.M.'s school for her behavior. (Tr. 111). J.M. reported that the teachers irritate her, yell in her face, and tell her what to do. (*Id.*). Her behavior was described as "up and down" with arguments, attitude, and stomping. (*Id.*). J.M. reported "mixed" emotions that were mostly anger or sadness. (Tr. 112). Ms. Congress reported that J.M. threw a book and laptop and used profanity. (Tr. 113).

On May 19, 2022, J.M. reported that she was feeling good, and that it was her last day of school. (Tr. 109). J.M. stated that she was experiencing "ups and downs" at home. (*Id.*). She would get into arguments with her mother because her mother would ask her to do things multiple times. (*Id.*). Ms. Baughman assessed that J.M.'s mental health appeared to be stabilized at that time. (*Id.*).

On May 31, 2022, Ms. Congress reported to Dr. Brewster that J.M. was arguing with a teacher at school, but she was manageable at home. (Tr. 101). J.M. reported that her mood ranged from mad to happy to sad, but not as irritable. (Tr. 102). J.M.'s mental status exam revealed that she had full affect, happy and angry mood, poor insight and judgment, and alert attention. (Tr. 104).

## IV.     THE ALJ'S DECISION

In her September 2021 decision, the ALJ first found *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) applied to this case. (Tr. 161). The ALJ then found that J.M. was a school-age child on the application filing date, and an adolescent at the time of the decision. (Tr. 162). The ALJ next determined that J.M. had not worked since January 25, 2020, the application filing date. (*Id.*).

The ALJ further determined that J.M. has the following severe impairments: unspecified mood disorder, oppositional defiant disorder ("ODD"), attention-deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), and allergic rhinitis. (*Id.*). However, the ALJ found none of those impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 163). The ALJ also determined that J.M. does not have an impairment or combination of impairments that functionally equals the severity of a listed impairment under 20 CFR § 416.924(d) and § 416.926(a). (Tr. 164). Therefore, the ALJ found J.M. not disabled. (Tr. 171).

## V.     LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931,

937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

## B. Standard for Child Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which

19

results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201. Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

### C.  <u>Child Functional-Equivalency Framework</u>

"A child who applies for supplemental security income is 'disabled' if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments that results in 'marked and severe functional limitations.'" SSR 09-03p, 2009 WL 396025, at *1 (Feb. 17, 2009) (quoting 20 C.F.R. § 416.906). The Commissioner will assess how a child-claimant can "function in [their] activities in terms of six domains," which "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). A "[the child-claimant's] impairment(s) is of listing-level severity if [they] have 'marked' limitations in [at least] two of the [six] domains in paragraph (b)(1) …, or [at least one] 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d). The Commissioner "will consider [the child-claimant's] functional limitations resulting from all of [their] impairments, including the [impairments'] interactive and cumulative effects." 20 C.F.R. § 416.926a(e)(1)(i). The Commissioner "will consider all the relevant information in [the child claimant's] case record that helps [the Commissioner] determine [the child-claimant's] functioning, including [their] signs, symptoms, and laboratory findings, the descriptions [the Commissioner] ha[s] about [the child-claimant's] functioning from [their] parents, teachers, and other people who know [the child-claimant], and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929." 20 C.F.R. § 416.926a(e)(1)(i). The child-claimant must prove that they are disabled. 20 C.F.R. § 416.912(a).

A marked limitation "interferes seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child claimant's "day-to-day functioning may be seriously limited when [their] impairment(s) limits only one activity or when the interactive and cumulative effects of [their] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that

is 'more than moderate' but 'less than extreme.'" It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

An extreme limitation "interferes very seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). This may be so even though their "impairment(s) limits only one activity or when the interactive and cumulative effects of [the child-claimant's] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(3)(i). "'Extreme' limitation also means a limitation that is 'more than marked.'" 20 C.F.R. § 416.926a(e)(3)(i). An extreme-limitation rating is the most severe, and it is reserved for "the worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). But it "does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

### D. **Analysis**

Ms. Congress raises two assignments of error: (1) the ALJ's determination that J.M.'s impairments did not functionally equal the Listings is unsupported by substantial evidence and (2) the evidence she submitted to the Appeals Council constituted new and material evidence that warranted a Sentence Six remand under Section 405(g). For the following reasons, I find both assignments of error lack merit.

#### 1. *The ALJ's Determination that J.M.'s Impairments Did Not Functionally Equal the Listings is Supported by Substantial Evidence.*

Ms. Congress asserts that the ALJ's determination that J.M.'s impairments did not functionally equal the Listings is unsupported by substantial evidence. Specifically, Ms. Congress argues that evidence supported the presence of marked or greater limitation in: (1) the domain of

acquiring and using information; and (2) the domain of caring for self. (ECF Doc. 6-1, PageID#1048-52).[3] The Commissioner responds that the ALJ's findings are supported by substantial evidence and free from harmful legal error. (ECF Doc. 7, PageID#1067-74). I find that the ALJ properly determined that J.M.'s impairments did not functionally equal the Listings. Specifically, the ALJ provided substantial evidence in support of her conclusion that J.M. had less than marked limitations in the acquiring and using information domain and caring for self domain.

### a. Substantial Evidence Supports that J.M. Had Less Than Marked Limitations in Acquiring and Using Information.

Ms. Congress argues that the ALJ failed to consider evidence that would support a finding of a marked limitation in the domain of acquiring and using information for J.M. (ECF Doc. 6-1, PageID#1048-50). She asserts that the ALJ did not consider test results demonstrating that J.M.'s reading comprehension and mathematic skills were below grade level, J.M. had tutoring five days a week for mathematics, and an IEP for assistance in reading and math. (*Id.* at PageID#1049-50). She also argues that the ALJ had a duty to develop the record by ordering a consultative examination to perform acceptable intelligence testing where the ALJ determined that the RIAS testing did not best represent J.M.'s abilities. (*Id.* at PageID#1050). Ms. Congress then argues that the teachers' statements regarding J.M.'s domain were inconsistent. (*Id.*). Finally, she disputes the ALJ's reliance on Dr. Brewster's May 2021 opinion because the basis of Dr. Brewster's opinion is "unknown" because she did not provide adequate reasoning. (*Id.*). I find these claims lack merit.

The domain for acquiring and using information focuses on how well a child acquires or learns information, and how well they use the information they have learned. 20 C.F.R. § 416.926a(g); *see also* SSR 09-3p, 2009 WL 396025 (Feb. 17, 2009). The ALJ found that J.M. had

---

[3] Ms. Congress raises no challenge to the ALJ's findings regarding J.M.'s limitations in other domains. (*See generally* ECF Doc. 6-1, PageID#1048-52).

a less than marked limitation in the domain of acquiring and using information based on her evaluation of the relevant medical, non-medical, and medical opinion evidence, including the prior medical findings and Dr. Brewster's May 2021 opinion. (Tr. 165-67).

Ms. Congress argues that the ALJ failed to adequately consider testing such as J.M.'s results from the R.E.A.D. Fluency, Comprehension, and Mathematics evaluations and the I-Ready diagnostic testing that demonstrated that her mathematics skills and comprehension skills were below grade-level. This argument is without merit. First, an ALJ is not required to recite every piece of evidence in the record. Rather, the ALJ need only discuss the relevant evidence necessary to demonstrate a reasoned consideration of the evidence overall. *Lee v. Berryhill*, No. 1:17-CV-1865, 2018 WL 3970553, at *3 (N.D. Ohio Aug. 20, 2016).

Next, substantial evidence supports the ALJ's conclusion that A.D. had a less than marked limitation in acquiring and using information. As the ALJ noted, J.M.'s school evaluators observed that J.M. had "many of the skills needed to be successful in a classroom setting, [such as,] remaining in a designated space, following whole class directions and rules, and interacting appropriately with peers." (Tr. 562). However, the evaluators observed, "Due to her limited attention to task, she may benefit from preferential seating to increase attending and more frequent checks to ensure she is understanding the skill being taught and making progress on the expected work." (*Id.*). The ALJ then discussed J.M.'s performance on the RIAS-2, but determined that the record did not establish the validity of J.M.'s performance, and that RIAS-2 scores are not a valid measure of intellectual testing under the Social Security regulations. (Tr. 166). Nevertheless, the ALJ noted that the state agency consultant had access to the RIAS-2 testing results at the reconsideration level and did not find these test results persuasive enough to find more restrictive limitations than the previous ALJ. (*Id.*). The ALJ also pointed out that Dr. Brewster, J.M.'s own

24

psychiatrist, opined in May 2021 that J.M. did not have any medically-determinable neurocognitive or intellectual disorder that caused her limitations with acquiring and using information. (Tr. 166). Specifically, Dr. Brewster indicated that J.M. had "***no evidence of limitations***." (Tr. 990) (emphasis added).

Ms. Congress' argument that the ALJ should have found Dr. Brewster's May 2021 opinion unpersuasive is not well-taken. Ms. Congress argues that the basis for Dr. Brewster's opinion is "unknown" because she did not provide reasoning for her answer regarding J.M.'s limitation (unlike Dr. Brewster's later-issued September 2021 opinion). (ECF Doc. 6-1, PageID#23). I disagree. Dr. Brewster found in her May 2021 opinion that J.M. did not have any marked or greater limitations in any domains. (Tr. 990-92). And Dr. Brewster provided discernible, sufficient explanations for her responses. Specifically, she noted that she had been treating J.M. since 2019. (Tr. 990). She further noted that J.M.'s prescribed medications may affect her appetite and sleep; J.M. was diagnosed with ADHD, PTSD, ODD, and an unspecified mood disorder; and J.M received weekly therapy, case management, and monthly psychiatric care, including medications that were "adjusted as needed." (Tr. 991-92). Further, Ms. Congress fails to challenge any of the ALJ's additional reasoning for finding Dr. Brewster's May 2021 opinion persuasive. (*See generally* ECF Doc. 6-1, PageID#1050). Specifically, the ALJ deemed Dr. Brewster's opinion persuasive because it was based upon and supported by a longitudinal treating relationship with J.M. (Tr. 170-71), and that the opinion was consistent with other record evidence such as the prior administrative medical findings (Tr. 293-99, 301-07). Thus, I find this argument lacks merit.

Ms. Congress further argues that the ALJ's decision is unsupported by substantial evidence because the ALJ failed to adequately consider testing such as the R.E.A.D. Fluency, Comprehension and Mathematics evaluations, and the I-Ready diagnostic testing that

demonstrated that her mathematics skills and comprehension skills were below grade level. (*See* ECF Doc. 6-1, PageID#1049-50). This argument is without merit. Although J.M.'s test results may support a conclusion that J.M. is markedly limited in these areas, remand is not necessarily appropriate if the ALJ's conclusion is supported by substantial evidence. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion."). Indeed, "the evaluation of whether substantial evidence exists does not involve deciding whether [the court] would have reached a different decision based upon any singular piece of evidence." *Smith v. Comm'r of Soc. Sec.*, 2015 WL 9467684, at *7 (S.D. Ohio Dec. 2, 2015), *report and recommendation adopted*, 2015 WL 9460280 (S.D. Ohio Dec. 28, 2015). With the other contradicting evidence, there is substantial evidence in the record to support the ALJ's conclusion that J.M. was not markedly impaired in her domain of acquiring and using information.

As a district court in the Sixth Circuit explained, "many children with 'less than marked' limitations may perform poorly in school and/or require significant additional resources for a variety of reasons that do not equate to a 'disability.'" *Darks v. Comm'r of Soc. Sec.*, No. 1:14-cv-921, 2016 WL 703581, at *5 (S.D. Ohio Jan. 25, 2016), *report and recommendation adopted*, 2016 WL 695992 (S.D. Feb. 22, 2016); *see also Dillard ex rel. A.D. v. Berryhill*, No. 1:18CV1567, 2019 WL 1989603, at *19 (N.D. Ohio May 6, 2019) (finding that even if claimant's state proficiency testing results indicating that claimant was not proficient in math, English language arts, or social studies supported a marked limitation conclusion, the ALJ offered substantial evidence in support of the opposite conclusion); *Williams ex rel. D.W. v. Comm'r of Soc. Sec.*, No. 1:16-CV-1201, 2017 WL 2304420, at *15 (N.D. Ohio Apr. 12, 2017), *report and recommendation adopted*, 2017

26

WL 2303998 (N.D. Ohio May 25, 2017); *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 833 (6th Cir. 2009) (finding that the ALJ presented substantial evidence for concluding a child had a less than marked limitation in acquiring and using information domain despite low-average cognitive functioning, low-average academic performance, being "about a year behind" in mathematics, and having been held back one grade level). An ALJ's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it. *Cutlip*, 25 F.3d at 286.

Ms. Congress also argues that the ALJ had a duty to further develop the record because the RIAS-2 testing of J.M.'s Composite Intelligence Index did not represent J.M.'s best abilities.  (ECF Doc. 6-1, PageID#1050). She states that there was "no indication as to where [J.M.'s] true level would have been." (*Id.*). Specifically, she asserts that if the ALJ disputed the validity of the RIAS scores, the ALJ could have ordered a consultative examination to perform acceptable intelligence testing. (*Id.*). Although an ALJ has the obligation to develop the facts and ensure that each claimant receives a full and fair hearing, the ALJ must not assume the role of counsel in doing so. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). Ultimately, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (rejecting plaintiff's argument that she had been denied a full and fair hearing and concluding that the ALJ's duty is triggered only "if the existing medical sources [in the record] do not contain sufficient evidence to make a [disability] determination"). And the ALJ has discretion to determine whether the record is sufficient to make a disability determination. *See* 20 C.F.R. § 416.920b(b)(1),(3).

Here, Ms. Congress was represented by counsel before the ALJ in this case. At the hearing, the ALJ asked counsel whether the written record was complete. (Tr. 251). Counsel confirmed the completeness of the written record at the hearing. (Tr. 251-52). Further, the determination of a "marked" or "extreme" limitation does not rely solely on any I.Q. test score. 20 C.F.R. § 416.926a(e); *Witherell ex rel. M.D.H. v. Comm'r of Soc. Sec.*, No. 13-13350, 2014 WL 6791381, at *4 (E.D. Mich. Sept. 30, 2014) ("IQ tests are generally understood to measure a person's cognitive capability; there is nothing in the record that suggests how that measure addresses performance, which is the focus of the first domain."). And the ALJ and state agency consultants had other evidence before them in assessing J.M.'s acquiring and using information domain when they reached the conclusion that J.M. had a less than marked limitation.

Finally, Ms. Congress points to what she views as an inconsistency of the opinions between two of J.M.'s teachers, Ms. Cornman and Ms. Pressman, regarding J.M.'s limitation in the domain of acquiring and using information. (ECF Doc. 6-1, PageID#1050). Specifically, Ms. Cornman observed that J.M. demonstrated slight problems in some aspects of her domain of acquiring and using information (*see* Tr. 602), whereas Ms. Pressman reported that J.M. was below grade level functionally in the areas of comprehension, mathematics, and behavior skills. (Tr. 552).

Ms. Congress fails to demonstrate how that makes these two teachers' statements inconsistent. Rather, both statements appear to be consistent because both teachers identified that J.M. had some problems in areas relevant to her domain of acquiring and using information. (*See* Tr. 552, 602). Further, Ms. Congress fails to cite any authority in support of her contention that the ALJ should have found a marked limitation because J.M. functioned below grade level. As stated above, the fact that a child performs poorly at school or requires significant resources does not necessarily compel a marked limitation finding. *See Darks*, 2016 WL 703581, at *5.

Accordingly, I find that this sub-claim lacks merit because the ALJ offered substantial evidence supporting J.M. had less than marked limitations in acquiring and using information.

### b. Substantial Evidence Supports that J.M. Had Less than Marked Limitations in the Caring for Self Domain.

Ms. Congress argues that the "totality of the evidence supports a marked limitation in the domain of care for self." (ECF Doc. 6-1, PageID#1052). As support, Ms. Congress points to evidence that she asserts the ALJ failed to consider. (*Id.* at PageID#1051-52). Specifically, she asserts that the ALJ failed to discuss treatment notes observing J.M. had irritability, difficulty sleeping, anger issues/anger outbursts, mood variability/mood swings, poor judgment and insight, impaired concentration and distractibility; anxious mood; and appetite variability. (*Id.*). She also argues that the ALJ failed to consider J.M.'s suspensions; tearfulness when discussing moods and her flashbacks; and overthinking about a previous traumatic incident where a teacher pulled her braids. (*Id.* at PageID#1051-52). Ms. Congress also notes that the ALJ did not discuss the medication changes made to address J.M.'s symptoms. (*Id* at PageID#1052). As an additional argument, Ms. Congress asserts that the ALJ should not have given Ms. Pressman's School Activities Questionnaire any persuasive weight because J.M. attended school virtually during the 2020-2021 academic year. (*Id.* at PageID#1051 (citing Tr. 552-53)).

When evaluating the domain of caring for self, an ALJ should consider how well the child is able to maintain a healthy emotional and physical state. This includes how well she gets her physical and emotional wants and needs met in appropriate ways; how she copes with stress and changes in her environment; and whether she takes care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029 (Feb. 17, 2009).

The ALJ concluded that J.M. had a less than marked limitation in the domain of caring for self. In support of her finding, the ALJ relied on treatment notes from J.M.'s pediatrician, as well

as a medical source statement from J.M.'s psychiatrist. (Tr. 169). Based on those sources, the ALJ noted that J.M. had been prescribed Abilify and Vyvanse and was receiving weekly therapy for PTSD, ADHD, ODD, and an unspecified mood disorder, which the ALJ observed resulted in no greater than moderate limitation in J.M.'s ability to care for herself from an emotional standpoint. (*Id.*). The ALJ also noted that J.M. had been taught coping mechanisms to calm herself in a classroom setting when she becomes upset. (*Id.*). The ALJ found that these coping mechanisms have been helpful to the extent that Ms. Cornman, J.M.'s teacher, did not observe any issues with J.M.'s ability to interact with others in the classroom in the December 16, 2020, function report. (*Id.*). Finally, the ALJ observed that, based on the record evidence through the reconsideration level, the state agency consultants opined that J.M. had less than marked limitations in her ability to interact with others. (*Id.*). These opinions, the ALJ stated, were consistent with J.M.'s February 6, 2020 IEP, treatment notes from J.M.'s pediatrician, therapy notes, and May 2021 evaluations from her psychiatrist, and the December 2020 teacher function report from Ms. Cornman. (*Id.*).

Here, the ALJ provided substantial evidence in support of her conclusion that J.M. had less than marked limitations in her domain of caring for self. Ms. Congress argues that the ALJ overlooked evidence relevant to her domain such as J.M.'s irritability, difficulty sleeping, anger issues/anger outbursts, mood variability/mood swings, poor judgment and insight, impaired concentration and distractibility; anxious mood; and appetite variability. (ECF Doc. 6-1, PageID#1051-52) (citing Tr. 401, 552-53, 684, 685, 686, 687, 722, 724, 7331, 732, 739, 740, 747, 748, 756, 757, 763, 764, 765, 844, 845, 852, 853, 872, 891, 911, 912, 950, 978, 985, 986. 995, 998, 1000, 1003, 1004, 1005). However, it is well-established that an ALJ is not required to discuss every piece of evidence to render a decision supported by substantial evidence. *See Bosely v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to

discuss each piece of date in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).

Next, a review of the ALJ's decision does not support a finding that the ALJ failed to consider the specific evidence cited in Ms. Congress' merits brief. In concluding that J.M. had less than a marked limitation in the domain for caring for self, the ALJ relied on the state agency consultant's opinion that J.M. had less than marked limitations in interacting with others based upon their review of the "treated and accommodated longitudinal effects of [J.M.'s] mental impairments." (Tr. 169). The ALJ found that the state agency opinions were consistent with J.M.'s February 6, 2020 IEP, treatment notes from J.M.'s pediatrician, therapy notes, a May 2021 evaluation, and a teacher function report from Ms. Cornman. (*Id.*). Significantly, most of the evidence that Ms. Congress relies on is the same evidence that the state agency consultants reviewed in reaching their opinions that J.M. had less than a marked limitation—which the ALJ deemed persuasive (Tr. 170).

Ms. Congress also disputes the ALJ's reliance on Ms. Cornman's opinion because J.M. attended school virtually during the 2020-21 academic school. Specifically, she argues that Ms. Cornman would have been unable to see how J.M. maintained her hygiene. However, this assertion does not detract from the probative value of Ms. Cornman's opinions. Ms. Cornman offered her observations on whether J.M. handled frustration appropriately, was patient, and asked for help as needed. All of these are factors that an ALJ may consider when evaluating a minor's domain for caring for self. 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. Further, although Ms. Cornman would not be able to observe aspects of J.M.'s hygiene—which even Ms. Pressman acknowledged she could not observe during virtual schooling (Tr. 553)—Ms. Congress fails to

demonstrate how Ms. Cornman was unable to make other observations about J.M.'s appearance, such as looking unkempt.

Finally, the ALJ presented additional reasoning for determining that J.M. had a less than marked limitation: Dr. Brewster's May 2021 opinion. In May 2021, Dr. Brewster had opined that J.M. had only a moderate limitation in caring for self. (Tr. 991). The ALJ additionally noted that the state agency opinions were consistent with J.M.'s updated February 6, 2020 IEP. (Tr. 169). As stated previously, Ms. Cornman also observed that J.M. had no problems in interacting with others. (Tr. 604). While Ms. Cornman certainly points to evidence supporting her preferred conclusion, the ALJ also pointed to evidence that supports her conclusion that J.M. had less than a marked limitation in her domain of caring for self.  Thus, I find Ms. Congress's sub-claim lacks merit.

> **2.** ***Sentence Six Remand is Not Warranted Because the New Evidence is Not Material and Plaintiff Did Not Establish Good Cause for Not Submitting This Evidence to the ALJ.***

Ms. Congress asserts that the new evidence she submitted on appeal—specifically Dr. Brewster's November 2021 opinion (Tr. 92-94) and subsequent treatment records (Tr. 17-50, 68-91, 101-57)—requires remand under sentence six of 42 U.S.C. § 405(g) because the evidence was new and material, not available at the time of the hearing, and might have led the ALJ to reach a different conclusion. (ECF Doc. 6-1, PageID#1052-54). The Commissioner concedes that this evidence is new but asserts that Ms. Congress fails to demonstrate that the evidence is material, and that good cause exists for not submitting this evidence to the ALJ. (ECF Doc. 7, PageID#1074-78).  Ms. Congress' second assignment of error is not well-taken because: (1) she fails to demonstrate that her newly submitted evidence is material; and (2) she fails to demonstrate good cause.

The Sixth Circuit explains that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Under Section 405(g), there are two kinds of remand: (1) a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and (2) a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-101 (1997); *see also Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 486 (6th Cir. 2006). District courts may not consider evidence that was not submitted to the ALJ in the sentence four context, but courts may consider such evidence to determine whether a sentence six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

The records Ms. Congress cites were submitted after the ALJ's September 13, 2021 decision. Therefore, this evidence may only be considered in the context of sentence six remand. The burden of showing that a remand is appropriate rests with the claimant. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). To justify sentence six remand, Ms. Congress must demonstrate that the evidence she now presents in support of a remand is new and material, and there was "good cause" for her failure to present this evidence in the prior proceedings. *See Hollon¸* 447 F.3d 269, 276-78 (6th Cir. 2010) (finding claimant failed to meet burden of showing good cause for failure to submit evidence and that evidence was material). Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 201) (internal quotations and citations omitted). Evidence is material "only if there is a reasonable probability that the [Commissioner] would have reached a

33

different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted). A claimant shows good cause by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted).

It is undisputed that this evidence is "new" because it post-dates both the hearing and the ALJ's decision. *See, e.g.*, *Franson v. Comm'r of Soc. Sec.*, 556 F.Supp.2d 716, 725 (W.D. Mich. 2005) (finding doctor's post-hearing statement is "new" because it was generated after the ALJ's decision); *Heck v. Comm'r of Soc. Sec.*, No. 1:20CV2133, 2021 WL 6693720, at *13 (N.D. Ohio Dec. 28, 2021), *report and recommendation adopted*, 2022 WL 228163 (N.D. Ohio Jan. 26, 2022). But Ms. Congress fails to meet her burden in establishing that this new evidence is material, and that there is good cause for her failure to submit this evidence to the ALJ.

Ms. Congress does not demonstrate that Dr. Brewster's November 2021 opinion is material. In her merits brief, Ms. Congress argues that it is material because Dr. Brewster offered further detail in support of her conclusions, as compared with the explanations in her prior (May 2021) opinion. (*See* ECF Doc. 6-1, PageID#1053-54). Yet, a doctor simply providing extra detail in support of her opinions does not render her post-hearing opinion material. Indeed, in *Kinsley v. Berryhill*, No. 5:17-cv-00604, 2018 WL 3121621 (N.D. Ohio Jan. 24, 2018), a court in the Northern District of Ohio rejected a claimant's similar argument where the claimant argued that the two opinions submitted by the claimant's doctor after the ALJ's decision were material because they were "far more detailed" than previously submitted opinions. *Id.* at *20. Further, Ms. Congress additionally fails to demonstrate that these additional details would have created a reasonable probability that the ALJ would have adopted Dr. Brewster's November 2021 opinion and found J.M. is disabled as a result. Dr. Brewster's November 2021 opinion is inconsistent with

her May 2021 opinion (Tr. 990-92), the prior state agency findings (Tr. 293-99, 301-07), and Ms. Cornman's statement (Tr. 603-07). And Dr. Brewster's new finding appear to conflict with other findings by the ALJ that Ms. Congress does not contest. For example, Dr. Brewster opined in her later opinion that J.M. had marked limitations in the domains of attending and completing tasks, interacting and relating with others, and health and physical well-being. (Tr. 92-94). Yet, the ALJ determined that J.M. had less than marked limitations in those domains. (Tr. 165, 167-68, 169).

Ms. Congress similarly fails to demonstrate that any of the subsequent treatment records are material. In her merits brief, Ms. Congress argues that the treatment records "continued to document" J.M.'s academic struggles, performance of activities in the dark, mood changes, poor insight and judgment, and worry about her mother. (ECF Doc. 6-1, PageID#1053). Ms. Congress asserts that Dr. Brewster's diagnoses for J.M. "remained" unspecified mood disorder, ADHD, ODD, and primary insomnia. (*Id.* at PageID#1053-54). The crux of Ms. Congress' materiality argument regarding these records is that subsequent treatment records basically contain the same findings as those treatment records before the ALJ. (*See id.*). In other words, this evidence is merely cumulative of other record evidence. Evidence is not "material if it is cumulative of evidence already in the record…" *Kinsley*, 2018 WL 3121621, at *16 (N.D. Ohio Jan. 24, 2018) (internal citations and quotations omitted); *see also Saliba v. Comm'r of Soc. Sec.*, No. 1:21-CV-1908, 2022 WL 18811452, at *9 (N.D. Ohio Nov. 3, 2022), *report and recommendation adopted*, 2023 WL 2139372 (N.D. Ohio Feb. 31, 2023).

But even if Ms. Congress had demonstrated materiality, Ms. Congress fails to offer any argument demonstrating good cause for her failure to submit this evidence to the ALJ. "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir.

2012). Rather, with respect to timing, the Sixth Circuit has taken "a harder line" approach to the good cause test and requires that a claimant provide "a valid reason for [her] failure to obtain evidence prior to the hearing." *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)); *see also Saliba*, 2022 WL 18811452, at *9 ("[A] claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why she did not cause the evidence to be created and produced until after the administrative proceeding."); *Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 470 F. App'x at 725.

Here, Ms. Congress' merits brief lacks any discernible argument regarding good cause. (ECF Doc. 6-1, PageID#1052-54). The only mention of "good cause" is Ms. Congress's cursory mention of good cause when summarizing the standards for a sentence six remand under Section 405(g). (*Id.* at PageID#1052).[4] *See Franson*, 556 F.Supp.2d at 276 (finding no "good cause" for failure to submit medical records generated post-hearing when moving party failed to explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision); *see also Brace v. Comm'r of Soc. Sec.*, 97 F. App'x 685, 592 (6th Cir. 2004) (finding decision to "arrange the tests just prior to [plaintiff's] ALJ hearing does not establish good cause to warrant a remand"); *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 859 (finding no good cause for failure to submit post-ALJ-decision doctor reports when plaintiff "had months to prepare for the hearing" and "could have sought the reports earlier" or "contacted the doctors or visited their offices if the reports were important to her case").

---

[4] It is well-settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting claimant did not sufficiently present her claimed errors).

Ms. Congress' failure to seek to hold the record open for post-hearing evidence presents an additional reason to conclude that her request for sentence six remand is not supported by good cause. *See Bass*, 499 F.3d at 514 ("[P]laintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in and of itself shows a lack of good cause."); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (good cause not shown when "the transcript of the hearing before the ALJ clearly indicat[ed] that counsel for the [plaintiff] did not seek to have the record remain open until such time as other evidence could be made a part of the record."). An independent review of the record does not reveal that Ms. Congress's attorney ever requested to hold the record open. Nor did Ms. Congress' attorney report either prior to or during the administrative hearing a need to secure an updated opinion from Dr. Brewster for any deficiency in the previous opinion or a worsening in J.M.'s condition. (Tr. 251-52, 264-65, 554).

Finally, an independent review of the record also does not support a finding of good cause. Indeed, as pointed out by the Commissioner, the sequence of events presents the opposite conclusion. Dr. Brewster completed her first opinion in May 2021. This opinion determined that J.M. had no more than moderate limitations in any of her domains. (Tr. 990-92). The ALJ held a hearing in August 2021, and she issued a written decision in September 2021. (Tr. 171, 265). On September 29, 2021, Ms. Congress expressed her frustration to Dr. Brewster regarding J.M. not being granted disability benefits. (Tr. 148). Ms. Congress informed Dr. Brewster that she had been told by her attorney that J.M.'s denial was a result of Dr. Brewster's notes. (*Id.*). Then in November 2021 – a mere two months after the ALJ's decision -  Dr. Brewster rendered a new opinion form. (Tr. 92-95). In the absence of any explanation or argument from Ms. Congress, it is entirely unclear what good cause exists for her failure to submit the evidence to the ALJ. (*See generally* ECF Doc.

6-1, PageID#1052-54). Ms. Congress, therefore, has not shown "a reasonable justification for the failure to acquire and present evidence before the ALJ" and thus cannot show good cause. *Foster*, 279 F.2d at 357. Accordingly, I recommend that the Court reject this assignment of error because a sentence six remand is not supported by the record or arguments offered in this case.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court reject Ms. Congress' assignments of error and AFFIRM the Commissioner's decision.

Dated: July 6, 2023                                        *s/Jennifer Dowdell Armstrong*
                                                          Jennifer Dowdell Armstrong
                                                          U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).